1  KENNETH R. O'BRIEN, Bar No. 072128
   E-mail: kobrien@littler.com
2  LITTLER MENDELSON
   A Professional Corporation
3  2520 Venture Oaks Way, Suite 390
   Sacramento, CA  95833.4227
4  Telephone:    916.830.7200
   Facsimile:    916.561.0828
5
   DENISE M. VISCONTI, Bar No. 214168
6  E-mail: dvisconti@littler.com
   LITTLER MENDELSON
7  A Professional Corporation
   501 W. Broadway, Suite 900
8  San Diego, CA  92101.3577
   Telephone:    619.232.0441
9  Facsimile:    619.232.4302

10 Attorneys for Defendant
   AMERICAN AIRLINES, INC.
11

12                UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15 EDWARD E. ANDERSON,                    Case No.  07-cv-3527 WHA

16              Plaintiff,                **DECLARATION OF KENNETH R.
                                          O'BRIEN IN SUPPORT OF
17       v.                               DEFENDANT'S MOTION FOR
                                          SUMMARY JUDGMENT AND/OR
18 AMR The parent of AMERICAN             SUMMARY ADJUDICATION OF CLAIMS
   AIRLINES INC, AMERICAN AIRLINES,       AND OR JUDGMENT ON THE
19 and DOES 1 through 5 INCLUSIVE,        PLEADINGS**

20              Defendants.

21                                        Date:    May 29, 2008
                                          Time:    8:00 a.m.
22                                        Ctrm:    9
                                          Judge:   Hon. William Alsup
23

24

25

26       I, KENNETH R. O'BRIEN, do hereby declare:

27       1.    I have personal knowledge of the facts set forth in this declaration and, if

28 called upon to do so, could and would testify competently thereto.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2520 Venture Oaks Way
Suite 390
Sacramento, CA  95833.4227
916.561.5300

FIRMWIDE:84983165.1 009001.1303                                    07-cv-3527 WHA

DECLARATION OF KENNETH R. O'BRIEN ISO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1       2.     I am the attorney of record for American Airlines, Inc., defendant herein.

2       3.     I took the deposition of Plaintiff on January 8, 2008.

3       4.     True and correct copies of the pages of Plaintiff's deposition to which Defendant's Motion for Summary Judgment refers are attached hereto as Exhibit A.

5.     The motion for summary judgment refers to Exhibit 2 to Plaintiff's deposition. A true and correct copy of that Exhibit is attached hereto as Exhibit B.

6.     The motion for summary judgment refers to the fact that when Plaintiff served Defendant American's Agent for Service of Process, only American Airlines was served with summons and process. Attached hereto is a true and correct copy of the Summons indicating service only on American is Attached hereto as Exhibit C.

7.     Plaintiff filed his Administrative Charge of Discrimination with the California Department of Fair Employment & Housing on January 24, 2006, a true and correct copy of which is attached hereto as Exhibit D.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct and that this Declaration was executed this 24th day of April, 2008, at Sacramento, California.

/s/ _____

KENNETH R. O'BRIEN

LITTLER MENDELSON
A Professional Corporation
2520 Venture Oaks Way
Suite 390
Sacramento, CA 95833 4227
916.561.5300

DECLARATION OF KENNETH R. O'BRIEN ISO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT "A"

JAN 2 5 2008

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


EDWARD E. ANDERSON,

                    Plaintiff,

vs.                              No. 07-CV-3527 WHA

AMR, The Parent of AMERICAN
AIRLINES, INC; AMERICAN AIRLINES,
and DOES 1 through 5, inclusive,

                    Defendants.          CERTIFIED
                                         COPY

_____


DEPOSITION OF EDWARD E. ANDERSON

San Francisco, California

Tuesday, January 8, 2008


REPORTED BY:
LYNNE LEDANOIS
CSR No. 6811

Job No. 79526

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11       Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15       I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18       IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20            JAN 2 3 2008

21  Dated: _____

22

23

24  LYNNE MARIE LEDANOIS
    CSR No. 6811

25

1    you and he talk about in terms of your deposition?

2        A    I just told him that I was going to have a

3    deposition today, and he asked me what for, and I said

4    what was on my claiming -- my wages lost and things like

5    that and the breakage of the machine.

6        Q    Did you talk about the same things with Ray?

7        A    Yes.

8        Q    Any of the other contract employees that you

9    spoke with about your deposition?

10       A    There was one other, but I can't think of...

11       Q    Is today normally a workday for you?

12       A    Yes, it is.

13       Q    So you took the day off from work?

14       A    I called and told them that I had a meeting

15   with the American Airlines attorneys.

16       Q    Who did you give that message to?

17       A    Lisa, Lisa Duffy.

18       Q    What is her last name?

19       A    Duffy, D-U-F-F-Y.

20       Q    What is her position?

21       A    I guess she is a CSM.  She answered the phone

22   as that, so I...

23       Q    When did you call her?

24       A    This morning.

25       Q    When do you normally begin your workday, at

1    8:00 or 8:30, approximately?

2         A    8:00.

3         Q    You are a part-time employee?

4         A    Yes.

5         Q    Of which I understand means that you work 20

6    hours a week?

7         A    Yes.

8         Q    So you work five days a week?

9         A    Yes.

10        Q    What are the days that you typically work?

11        A    They're from Sunday through Wednesday -- or

12   Thursday.  Sunday through Thursday.

13        Q    Have you held the same basic schedule since

14   American purchased TWA?

15        A    Yes, I have.

16        Q    Okay.  Have you reported to supervisors at

17   American since American purchased TWA?

18        A    Have I --

19        Q    Reported to any supervisors at American?

20        A    Report what now?

21        Q    In other words, they are your supervisor, they

22   are your manager that you go to if there's questions?

23        A    Okay.  Now you want to know for questions --

24   yes, I have.

25        Q    We'll go back and talk about each of these

1    was over the skycap area until she was replaced by

2    Ms. Harris; is that about right?

3        A    Yes.

4            MR. ROESTI:  I did not pose an objection, but

5    you did testify -- offer testimony, and I think his

6    answer is confirming the testimony.

7            The testimony offered was that the year that

8    American Airlines took over TWA, and I think it would be

9    wise to confirm that that is the year that he recalls.

10           MR. O'BRIEN:  Yes, okay.  I thought we had put

11   that on the record.

12   BY MR. O'BRIEN:

13       Q    My records indicate that you started working

14   for American Airlines as part of the acquisition of TWA

15   in December of 2001.  Does that right to you?

16       A    Sounds close to being right, yes.

17       Q    Let me ask you a couple of background questions

18   because I skipped over that.  We'll just do this

19   quickly.

20           Where do you currently live, Mr.~Anderson?

21       A    Where do I live now?

22       Q    Yes, sir.

23       A    801 Galway Drive, G-A-L-W-A-Y Drive, Apartment

24   Number 9, in San Lorenzo, California 94580.

25       Q    How long have you lived there?

1        A    No, not TWU.

2        Q    One of the others?

3        A    Yes, it was -- I can't remember exactly.

4        Q    Are you currently unionized?

5        A    No.

6        Q    As I understand it, the skycaps at American

7    have not been unionized at least since you've been

8    working for American?

9        A    No, they are union.

10        Q    So you are union?

11        A    No.

12        Q    Okay.

13        A    I am an American Airlines employee.

14        Q    Understood.  Let me go back.

15            You are not a union member now -- that's a bad

16    question.

17            Skycaps who are employed by American, I don't

18    think are union members at this time in San Francisco;

19    is that right?

20        A    Correct.

21        Q    And has that been true throughout the time

22    you've worked for American Airlines?

23        A    Yes.

24        Q    And you did not -- apparently, you did not know

25    Ms. Javier before you went to work at American Airlines;

35

1    is that also correct?

2         A    Correct.

3         Q    Let's go back again to the same time period

4    just before the acquisition.   Okay?

5              At TWA, did you receive hourly wages?

6         A    Yes.

7         Q    And did you also receive tips?

8         A    Yes.

9         Q    And do you recall what your hourly rate was

10   just before the acquisition?

11        A    Yes.

12        Q    What?

13        A    I say yes.   It was close to 10.46 an hour.

14        Q    When you started working at American Airlines,

15   did you also receive an hourly wage?

16        A    Yes.

17        Q    And at that time, you could also receive tips;

18   right?

19        A    Yes.

20        Q    Let's go back then to when you started at

21   American in December of 2001.

22             Do you recall, Mr.~Anderson, what your hourly

23   wage rate was?

24        A    I'm not going to say exactly, but it was at

25   10.46, and we were supposed to get -- as you go on --

36

1    this is done through the city --

2        Q    Okay.  So you apparently started -- it sounds

3    like when you started at American, your hourly rate

4    stayed the same?

5        A    Yes.  The possibility is it may have increased

6    a few pennies, but...

7        Q    I understand.  Do you know what your hourly

8    rate currently is?

9        A    No, I don't.

10       Q    Do you have any idea?

11       A    Yes.  Close to $11.

12       Q    Close to 11, did you say?

13       A    Yes, I think.

14       Q    Let's go back then to the time that the

15   acquisition actually took place.

16            I assume at some point in time you heard that

17   American was going to take over TWA; right?

18       A    Yes.

19       Q    At some point in time, did you meet with

20   anybody from American to discuss whether you wanted to

21   continue to work as a skycap for American?

22       A    Yes.

23       Q    Do you recall who it was that you met with to

24   have that discussion?

25       A    Ron Olson was one -- he was in charge of

1    customer service -- and then the station manager --

2        Q    Do you recall that person's name?

3        A    No, I can't -- I had it written down, but I

4    can't recall his name.  His first name was Arthur.

5    That's all I can tell you.

6        Q    And did you meet one-on-one -- let's just start

7    with Mr. Olson.

8             Did you meet one-on-one with him or was it part

9    of the group meeting with other skycaps?

10       A    It was a group meeting with the rest of the TWA

11   skycaps.

12       Q    Was there one meeting with him or more than

13   one?

14       A    We only had one at that time.

15       Q    Do you remember what Mr. Olson said in that

16   meeting?

17       A    Mr. Olson told us American's policy and all

18   that.  Then me of all the rest, I'm the only one that

19   said, well, aren't we here under the TWA clauses, you

20   know.  And he said, oh, no, this is -- he told me no.

21   And I said, well, I think we are, because our lawyer

22   told us that things would continue as the court has --

23       Q    I'm sorry.  I lost you.

24       A    Everything stays as is.

25       Q    Okay.  You said that to Mr. Olson?

1    A    I said it.  Then he said, oh, no, no, no.

2    Q    Now, you said a moment ago that he said what

3  American Airlines policy is?

4    A    Policies were at that time.  Informed us on

5  what to expect from American Airlines, and if we wanted

6  to -- you know, agreed with them and all that.

7    Q    Do you remember what he said in that regard?

8    A    Well, I do remember, because I told him they

9  came around and gave my shifts and told me there was

10  going to be a four-hour shift.  And I said, well,

11  everything is supposed to be status quo.  He said, what

12  do you mean?  I said that it's supposed to be status quo

13  because we were under this court order.

14         And he said, oh, no, you're not under no court

15  order.  You're here under American Airlines.  I said,

16  no, we are under a court order.  He said, oh, no.  I

17  said, well, I'll tell you what, you better call Dallas

18  and find out for sure.

19    Q    Did you speak to him again about that?

20    A    Yes.  In fact, he came to me about two or three

21  weeks later.

22    Q    What did he say to you?

23    A    He said, you're right.  He said -- but he still

24  did not give me the added hours that I was supposed to

25  be under, the same as TWA.

1      Q    Okay.  So let me see if I understand.

2           You mentioned a moment ago that you thought

3     there were a total of maybe nine skycaps on your shift

4     at TWA --

5      A    Yes.

6      Q    -- and about 12 to 13 skycaps at TWA

7     altogether --

8      A    Yes.

9      Q    -- just before the acquisition?

10     A    Well, close to that, yes.

11     Q    I understand.  It's approximate.

12          Do you know if all of the TWA skycaps became

13    American Airlines employee skycaps?

14     A    No, they did not.

15     Q    When you became an American Airlines skycap,

16    can you estimate for us how many other TWA skycaps also

17    joined American?

18     A    From San Francisco, I think it was six of us.

19     Q    When you joined American, were you the most

20    senior skycap at TWA?

21     A    No.  I was the lowest.

22     Q    Okay.  And do you know if the skycaps who

23    joined American joined because of their seniority at

24    TWA?

25     A    No, I don't know that.

1    Q    Do you know why some of the skycaps at TWA did

2    not join American?

3    A    Two or three of them -- well, at least two of

4    them I know retired.

5    Q    Okay.  So you were the least senior?

6    A    Yes.

7    Q    How old are you now, sir?

8    A    I'm 74 years old.

9    Q    So in December of 2001, you would have been

10   approximately 68?

11   A    Probably.

12        MR. ROESTI:  Subtract six years.

13        MR. O'BRIEN:  I think so.

14   BY MR. O'BRIEN:

15   Q    You say you're 74 now?

16   A    Yes.

17   Q    So you were approximately 66 (sic)?

18   A    Yes.

19   Q    Of the TWA skycaps who became American Airlines

20   employees, were you the most senior, still the least

21   senior, or something else?

22   A    I think agewise -- no.  As far as seniority, I

23   was the lowest one on the seniority list.

24        MR. ROESTI:  What do you mean by lowest on the

25   list?

41

1          THE WITNESS:  I had the less years of the other

2    skycaps.

3    BY MR. O'BRIEN:

4          Q    I understand that.  Were you the oldest skycap

5    though?

6          A    No.

7          Q    There were other TWA skycaps who

8    chronologically were older than you?

9          A    Yes.

10         Q    And did any of those people become American

11   Airlines skycaps?

12         A    Yes, they did.

13         Q    Are any of the people who came over from TWA at

14   the time that you came over still working as skycaps for

15   American?

16         A    No.

17         Q    Who was the last -- if you recall, who was the

18   last person who used to be a skycap at TWA who worked

19   for American besides you?

20         A    Agewise?  Is that what you mean?

21         Q    It does not have to be by age, no.

22         A    The last one was Alonso Brown.

23         Q    Do you know if Mr. Brown still works for

24   American?

25         A    No, he does not.

42

1    short break.

2    BY MR. O'BRIEN:

3        Q    Do you know how old Mr. Brown was when he

4    retired?

5        A    I think 77 or 76.

6        Q    Let's go back to the time that you started

7    working at American.

8            You had been working a 30-hour shift for TWA?

9        A    Yes.

10       Q    And when you started at American, you got a

11   20-hour shift?

12       A    Yes.

13       Q    And has that shift, the 20-hour shift, been in

14   place the whole time you've worked at American?

15       A    Yes.

16       Q    Were there other TWA skycaps whose schedule was

17   reduced when they came over and started working at

18   American?

19       A    No.  I can't recall any, no.

20       Q    You don't recall?

21       A    They were all eight-hour shifts.

22       Q    Were any of the other skycaps African American?

23       A    All of them -- well, I take that back.  One was

24   from Indonesia and the others were African American.

25       Q    Were any of the others over the age of 40?

EDWARD E. ANDERSON                    01/08/08

1        A    Yes.

2        Q    Were they all over the age of 40?

3        A    Yes.

4        Q    Currently, you're the only American Airlines

5   employee skycap at SFO?

6        A    Yes.

7        Q    How many G2 skycaps would you estimate work on

8   the same shift that you work?

9        A    Between five and six.

10        Q    Do you know how many G2 skycaps work for

11   American altogether at SFO?

12        A    I don't know offhand.  But they have two

13   shifts -- actually, three shifts.

14        Q    Let's first start with the shift that you work

15   on.  Are any of those skycaps African American?

16        A    One is.

17        Q    And do you know what the racial composition is

18   of the rest?

19        A    One white boy, and the rest are all Philippino

20   or Spanish.  I think there's two Spanish there.

21        Q    Let's talk about the separate question of how

22   many skycaps do you believe G2 employs at the American

23   facility altogether at this time?

24        A    Can you repeat?

25        Q    Sure.  That was a bad question.

45

1    Q    Do you know if they are all over the age of 40?

2    A    Not all of them, no.

3    Q    Are most of them over 40?

4    A    Most of them.

5    Q    When Mr. Olson told you that your new shift was

6    going to be 20 hours a week -- strike that question.

7    Do you know how many American Airlines skycaps

8    were already working for American at the time of the

9    acquisition of TWA at San Francisco?

10    A    There were none in San Francisco working for

11    American itself, American Airlines.  They had

12    contractors.

13    Q    So even in December of '01, American was using

14    contract employees to do skycap duties?

15    A    Yes.

16    Q    So to the best of your knowledge, there were

17    not any actual American employees doing those duties

18    before the acquisition?

19    A    Not as skycaps, no.

20    Q    Understood.  Okay.

21    Do you know the name of the company that

22    American was using as its contract company at that time?

23    A    Globe.

24    Q    Globe?

25    A    Yes.

1    Q    I understand Globe changed its name to G2; is

2   that right?

3    A    Yes.  Excuse me.

4    Q    So they were working, basically, for the same

5   company as G2; it's just that the name was changed?

6    A    Yes, that I know of.

7    Q    Okay.  I understand.  I appreciate that.

8         When you started working for American Airlines

9   in 2001, did the curb -- remember we talked earlier

10  about the physical location of the curb for American and

11  TWA?

12   A    Yes.

13   Q    Did the company -- did American stop using that

14  TWA site or did it continue to use that part of the

15  curb?

16   A    No, that was quite a while ago.  When we talked

17  about American and they were in the same building,

18  that's quite some time ago.  Then when they opened a

19  third building, American moved over to there.  And we

20  were -- TWA was in a building in the south terminal.  It

21  was the north, south -- central, north and south at the

22  time.

23   Q    When you started working for American, were

24  American's curbside operations just at the one spot?

25   A    Yes.

48

1          MR. ROESTI:  When you mean curbside operations

2     at one spot, are you referring to just one station or

3     are you referring to a series of stations that would be

4     in one relative location?

5          MR. O'BRIEN:  I'm just talking about the curb

6     as opposed to the stations.  We'll talk about the

7     stations in a moment.

8          MR. ROESTI:  But you're including the stations

9     on the curb.  I don't mean the stations inside, but on

10    the curb.

11         MR. O'BRIEN:  Right.  Yes.  Okay.

12    BY MR. O'BRIEN:

13    Q    So when you started at American Airlines, how

14    were you hours set?  Who determined what the hours of

15    your shift were going to be?  Was it Mr. Olson, to the

16    best of your knowledge?

17    A    Yes.

18    Q    And what did he tell you your hours would be?

19    A    He gave me hours from 10:00 to 2:00.

20    Q    What had you been working at TWA?

21    A    I had been working morning shift.

22    Q    What time did you start?

23    A    7:00 to -- well, eight-hour shift -- no --

24    yeah, six-hour shifts at that time.  From 7:00 to, I

25    think, 1:30 or 2:00, or something like that.

EDWARD E. ANDERSON                                01/08/08

1       Q   When you claim over to American from TWA -- I

2   just want to go back to something and make sure I

3   understand what I think you said earlier.

4           When you came over from TWA, you were the least

5   senior TWA skycap?

6       A   Yes.  I was the lowest seniorized skycap.

7       Q   Do you know if Mr. Olson set the schedules for

8   the other formerly TWA skycaps who came over to

9   American?

10      A   Yes, with their help.

11      Q   With the help of those skycaps?

12      A   Yes.

13      Q   And were some of those --

14      A   He was trying not to use seniority, our

15  seniority, and he had all the others getting the best

16  time, all the contractors getting the best time.

17      Q   Did any of the former TWA skycaps work shifts

18  at American beginning at 7:00 a.m. after American

19  acquired TWA?

20      A   After they acquired it?

21      Q   Yes.

22      A   Well, they started them out with lower -- you

23  know, not -- then they all told them that we were

24  American employees and that we should be able to be the

25  top -- you know, be able to pick our top shift, because

50

1    they were contractors, and you treat your -- if you are

2    an employee, you treat your employers the right way

3    rather than the contractors.

4        Q    Let me focus in, though, a little bit on a

5    little bit different subject.

6            My question was just whether or not you know if

7    any of those former TWA skycaps worked shifts beginning

8    at 7:00 a.m. once they came over to American.

9        A    I think they changed the time earlier than

10    7:00.

11        Q    So they would start earlier?

12        A    They started earlier.

13        Q    Okay.  You mentioned a moment ago that you

14    think American currently has three shifts of skycaps?  I

15    think you said that.

16        A    Well, they got more than that now.  They come

17    different times of the day.

18        Q    Do you know when the first flight of the day

19    out is for American at SFO now?

20        A    I think it's 6:00 a.m, six something.

21        Q    Do you know what time the first skycap, whether

22    it's with G2 or not, shows up and begins working the

23    curb?

24        A    I think they start at 4:30.  I'm not sure.

25    4:30 or 3:30.  I'm not sure.

1      Q    Did Arthur ever get back to you and tell you

2  what your hours were going to be?

3      A    Arthur didn't, but he had Mr. Olson.

4      Q    We've already talked about what Mr. Olson told

5  you?

6      A    M-hm.

7      Q    Yes?  You have to answer with words.  He talked

8  to you about it?

9      A    And told me that I was right and that we were

10  under the court order and that my seniority, I should be

11  able to pick the time I want to come to work, you

12  know -- well, not just me pick the time.

13          But then he asked me what would I consider to

14  be a good time.  That was after, you know.  I said,

15  well, 6:30 or 6:00.  He said, oh, no, we have too many

16  on that one.  He said -- I said, okay, 8:00.  And he

17  said, fine.  He said, you'll work from 8:00 to 4:00.

18      Q    Did that change?

19      A    No.  That's what I've been on ever since then,

20  but I still did not get my six hours that I should have.

21      Q    You just said he told you 8:00 to 4:00?

22      A    Yes -- I mean 8:00 to 12:00.  I'm sorry.

23      Q    That's fine.  I just wanted to clarify.

24          So Mr. Olson is the one who told you that you

25  would be working from 8:00 to noon?

1       A    Right.

2       Q    When did you first, if you can recall -- well,

3  never mind that.

4            When you began working for American Airlines in

5  2001, the skycaps did not collect this $2 per bag fee;

6  right?

7       A    No, they did not.

8       Q    That went into effect in '05, I believe; right?

9       A    Yes.

10       Q    So let's talk about -- let's move from the

11  period when American acquired TWA and we'll move forward

12  to when that fee was instituted, but not quite there

13  yet.  Okay?

14            MR. ROESTI:  Will this be a good time for a

15  break?

16            MR. O'BRIEN:  Yes.  Good.  Let's take a short

17  break, and I can look the documents that you and

18  Mr.~Anderson have that we've talked about earlier.

19            VIDEOGRAPHER:  We are now going off the video

20  record.  The time is 11:07 a.m.

21                      (Recess Taken.)

22            VIDEOGRAPHER:  We are now back on the video

23  record.  The time is 11:23 a.m.

24  BY MR. O'BRIEN:

25       Q    Let's go back chronologically, Mr.~Anderson, to

54

1    the point where I think we left off.  We had gotten to

2    the point where the acquisition of TWA had gone through

3    and you had started working as a skycap for American,

4    and now we will move forward, but prior to the time that

5    the $2 per bag charge was instituted, all right, so

6    that's the time period for these questions I'm going to

7    be asking you.

8        A    All right.

9        Q    When you started working as a skycap for

10   American in 2001, did you have a set location at the

11   curb that you always took during your shift?

12       A    No.

13       Q    How would you determine what position --

14            MR. ROESTI:  Wait a minute.

15            You indicated with your hand that you might

16   want to say more.  Did you complete your answer?

17            THE WITNESS:  Well, sorry.  I would like to say

18   more.

19   BY MR. O'BRIEN:

20       Q    Sure.

21       A    I had a location.  It was at the west end of

22   the airport.  All the contractors were down where the

23   heavy traffic came and I was up at the other end.  There

24   was about three others up there with me at the time.

25   There was always three of us up there.

1      Q    So as I understand it, then, the contract

2  skycaps would have been at the east end of the curb?

3      A    They were at the east end of the curb.

4      Q    And you were at the west end?

5      A    West end, right.

6      Q    Were the other employees who were with you at

7  the west end of the curb, were they also former TWA

8  skycaps?

9      A    Two were.

10      Q    And was one of those folks --

11      A    Excuse me.  I'm sorry.

12      Q    That's all right.

13      A    Three.

14      Q    Okay.  Let me make sure I understand.

15           You were located at the west end of the curb?

16      A    Yes.

17      Q    There were a few other skycaps with you at the

18  west end?

19      A    Yes.

20      Q    How many of those were Globe contract skycaps

21  at that time?

22           MR. ROESTI:  Excuse me.  Would you identify the

23  definition of the word "globe"?

24           MR. O'BRIEN:  Globe is the company we've been

25  talking about.

56

1      MR. ROESTI:  Okay.

2      Do you have the question in mind?

3      THE WITNESS:  Would you repeat it?

4   Q   Sure.  I just want to know, you're on the west

5   end of the curb when you started for American; right?

6   A   Yes.

7   Q   I think you said there were three other skycaps

8   there during your shift?

9   A   Yes -- two others.

10  Q   Were they both former TWA skycaps?

11  A   No.

12  Q   Were either of them TWA skycaps?

13  A   No.

14  Q   They were both Globe contract employees?

15  A   Yes.

16  Q   During the shift that you were working when you

17  started for American, were any of the former TWA skycaps

18  working at the other side of the curb, the east side of

19  the curb?

20  A   Yes.

21  Q   How many former TWA skycaps were working that

22  end of the curb?

23  A   Three, I believe.

24  Q   They were all senior to you in terms of the

25  factors we've talked about already?

1    BY MR. O'BRIEN:

2        Q    Let me ask you a different question then.

3            When did you start writing down your tip

4    income?

5        A    I started writing down, I guess -- well, at

6    first when I started, I did not do it every day.  And

7    then I think it was in -- some part of '06 I started.

8        Q    And sometimes do you write it down and other

9    times you don't?

10       A    Most of the times I write it down.  As of late

11   the past year, I've been trying to write it down almost

12   every day.  Then, again, I get rushed, and I have to

13   leave or something, so I just -- because I have to copy

14   each one of these.

15       Q    Understood.  Okay.  So I'll look at these

16   during the break, but I understand what you're saying.

17           Sometimes you write them down and sometimes you

18   don't?

19       A    Most of the time I try to write it down.

20       Q    Okay.  You mentioned that when you started as

21   an American employee, as a skycap at SFO, you were

22   working the west end of the curb; right?

23       A    When I started with American, yes.

24       Q    Are you still working at that location?

25       A    Yes, I am.

65

1      Q    Did any of the TWA skycaps who came over to

2    American work the east side of the curb, other than

3    Mr. Brown, at any time?

4      A    Yes.

5      Q    Do you recall the names of any of those --

6      A    Mr. Cass, Mr. Hassin, Mr. Brown.  I think that

7    was it.

8      Q    Were any of those individuals African American?

9      A    They all were -- well, no, they are not.

10   Mr. Hassin was like -- he was from Indonesia.

11     Q    And the others were African American?

12     A    African American, yes.

13     Q    They were all over the age of 40?

14     A    Oh, yes.

15     Q    And all senior to you in the way we've used

16   that phrase before?

17     A    In seniority as work being done, yes.

18     Q    And did those individuals that you've just

19   named, did they ultimately stop working for American?

20     A    They stopped when they retired, yes.

21     Q    As far as you know, did they all leave American

22   when they retired?

23     A    Yes.

24     Q    As they left the curb, were their slots taken

25   over by a contract employee?

1       A    Yes.

2       Q    Let's go back then to the period between

3  December of '01, when American took -- when you went to

4  work for American, and before the time that the bag

5  charge was instituted.

6            Did you have any kind of physical work station

7  or podium that you worked at or were regularly assigned

8  to during that period?

9       A    This was before?  Yes.

10           MR. ROESTI:  I want you to be clear on the time

11  period.  Don't just say "this is before."

12           So what time period are you talking about?

13           MR. O'BRIEN:  I said several times after

14  December of '01, but before the bag charge was

15  instituted.

16  BY MR. O'BRIEN:

17      Q    So go ahead.

18      A    You asked me did I have a station?

19      Q    Yes.

20      A    No, I did not have -- well, I could work up

21  there at the west end, any one of the podiums that were

22  up there, which was three to four podiums, depending on

23  how busy they were.

24      Q    When customers -- strike that.

25           When people would drive in to the curb to check

1    their bags, I take it that they approached from the east

2    side, and then they would drive through and they would

3    ultimately get to the west part of the curb?

4        A    Yes.

5        Q    That was the direction of the traffic?

6        A    Yes.

7        Q    Okay.  Fine.  And at that period of time that

8    we've been talking about, from '01 to prior to the

9    institution of the bag charge, did you have to keep any

10   record of tip income that you turned in to American?

11       A    No.

12       Q    Was there any kind of paperwork that you had to

13   do?

14       A    No.

15       Q    Would you be responsible for issuing paperwork

16   to the passenger, for example, a luggage tag or a claim

17   check?

18       A    Yes.  Claim check.

19       Q    Were you responsible during the same period of

20   time for issuing any kind of boarding papers to the

21   passenger?

22       A    They came out with the claim checks.  The

23   boarding pass came out with it.

24       Q    Okay.  Fine.  During the period of time from

25   December of '01, when you became an American skycap, up

1    to the time that the bag charge was instituted, did you

2    ever put in for a transfer to any other city that

3    American flew out of?

4        A    We were not allowed to put in for a transfer by

5    court order.  Everything stayed status quo.  We were not

6    allowed to work any overtime.  All this stuff was on the

7    status quo.

8        Q    So my understanding is, you did not try to

9    transfer?

10       A    I spoke verbally to them, and they said that

11   the contract -- in fact, when Mr. Olson talked to us,

12   TWA skycaps said they went along with Arthur, they told

13   us then that we would not be able to transfer.  They

14   told us this.

15           MR. ROESTI:  And then you said something to

16   them at the time then; is that correct?

17           THE WITNESS:  I said that's bad.  I would like

18   to transfer to St. Louis.  But that was it.  You know,

19   you're not allowed to do those things.

20   BY MR. O'BRIEN:

21       Q    That was applied to all of the skycaps?

22       A    Yes.

23       Q    And you said a moment ago you could not work

24   overtime?

25       A    No overtime.

69

1    started working at American; right?

2        A    Yes.

3        Q    And she was already working, as far as you

4    know, for American Airlines but perhaps in a different

5    city?

6        A    Possibly.

7        Q    From the time that you started working as an

8    American employee in December of '01 up until the time

9    that the bag charge was instituted, did you have any

10   problems with Ms. Javier?

11       A    At one time, yes.

12       Q    When did this occur?

13       A    This was after the charge was -- well --

14       Q    Well, let me set the stage, though, again,

15   because I have not gotten to that point.

16            Again, I'm just asking about the period of time

17   after you started working for American but before the

18   bag charge started.  Okay?

19       A    Yes.

20       Q    So my question is, during that period of time,

21   before the bag charge was instituted, did you have any

22   problems working with Jocelyn Javier?

23       A    No.  None that I can remember.

24       Q    Did you have any problems working with any of

25   the other people who might have been managers or

1    supervisors again during that same period of time?

2        A    No more than what me and Ron Olson discussed

3    about for them to check with Dallas on things.  That's

4    all.

5        Q    You've told us all about that?

6        A    Yes.

7        Q    Okay.  Would it be correct, then, to say that

8    before the bag charge was instituted, you did not have

9    any problems with any of the managers, other than this

10   discussion with Mr. Olson that you have told us about?

11       A    I can't remember anything else.

12       Q    From '01 to '05, when the bag charge was

13   instituted, you were working 20 hours a week

14   consistently?

15       A    Well, I was scheduled to work 20 hours a week,

16   yes.

17       Q    Okay.  Did you sometimes work less than 20

18   hours?

19       A    Sometimes, yes.

20       Q    Did you sometimes work more than 20 hours?

21       A    Never more than 20 hours.

22       Q    So you were -- so it sounds like if you were

23   going to change a shift with anybody, it would be to --

24   you would give up some of your hours as opposed to

25   picking up additional hours; is that right?

1          A    Correct.

2          Q    And that's all that Jocelyn told you, about

3     going to see Mr. Olson?

4          A    Yes.

5          Q    Do you know if the contract employees had to

6     sign any similar paperwork?

7          A    Yes.

8          Q    Do you know if the paperwork that they had to

9     sign was similar to what you had to sign?

10         A    I don't know exactly.  I was told by some of

11    them, but that's hearsay.

12         Q    Did they tell you that they also had to collect

13    that same charge?

14         A    Yes.

15         Q    Did they tell you they had to keep some of

16    these records that you've got here for us?

17         A    No.

18         Q    Did they indicate to you that they had to keep

19    any kind of record?

20         A    No.

21         Q    But they told you they had to charge the $2 fee

22    too?

23         A    Yes.

24         Q    They have to collect the fee and turn it in at

25    the end of their shift?

EDWARD E. ANDERSON                                    01/08/08

1    Q    And that's all Jocelyn said?

2    A    Yes.

3    Q    Did you eventually start working -- well,

4  strike that.

5         Did you eventually start collecting the $2 fee

6  from the passengers?

7    A    I started the first day that they started it.

8  That was on the 15th of August.  That's when I started

9  collecting the money.

10   Q    Is that when you started --

11   A    That's when I started keeping records of -- I

12  think that was when I first -- in fact, the records may

13  be a little later than that.  I'm not sure.

14        MR. ROESTI:  It may be helpful if you specify

15  what year --

16        THE WITNESS:  It was '05 that I did start

17  keeping records, I think I did.

18  BY MR. O'BRIEN:

19   Q    So in '05, you started collecting the $2 fee?

20   A    Yes, August 15th.

21   Q    You started filling out the paperwork that we

22  have here?

23   A    This year -- oh, you mean the sheets that we

24  had to turn in to American Airlines?  Yes, I did.

25   Q    And you had to turn in the cash?

1    A    Yes.

2    Q    And you had to total up the cash that you

3  received --

4    A    Yes.

5    Q    -- to make sure it matched the number of bags

6  you got to check; right?

7    A    Yes.

8    Q    When you started doing that, you were

9  apparently the only American employee still actually

10  working at the curb; right?

11    A    Yes.  No, I take that back.  Mr. Brown was

12  still scheduled to work.

13    Q    But was he physically working or was he off?

14    A    He was off on a medical.

15    Q    And the rest of the skycaps were all contract

16  employees?

17    A    Yes.

18    Q    As far as you know, they were collecting the

19  same fee?

20    A    Yes.

21    Q    They were performing some kind of paperwork

22  function to show to their supervisors the amount of fees

23  that they had collected too?

24    A    Yes.

25    Q    When you started in August of '05 to collect

| 1 | AFTERNOON SESSION |
|---|---|
| 2 | VIDEOGRAPHER:  This is the beginning of |
| 3 | videotape number two.  We are now back on the video |
| 4 | record.  The time is 1:00 p.m. |
| 5 | BY MR. O'BRIEN: |
| 6 | Q   Hi, Mr.~Anderson.  We're back on the record |
| 7 | after lunch. |
| 8 | I'll get back to where we were in just a |
| 9 | moment, but over the lunch hour I had an opportunity to |
| 10 | look quickly at the documents which you and Mr. Roesti |
| 11 | have brought with you today and which are going to be |
| 12 | copied for me by your counsel. |
| 13 | I had a couple of questions about that.  I did |
| 14 | start to find some sheets where there were some numbers, |
| 15 | usually in ink, written on the back of the sheet. |
| 16 | Is that how you recorded your tip income? |
| 17 | A   Yes. |
| 18 | Q   When you did that, were you being truthful and |
| 19 | accurate about the amount of tips you received -- |
| 20 | A   Yes, I was. |
| 21 | Q   You need to wait until I finish. |
| 22 | You were being truthful and accurate -- |
| 23 | A   Yes. |
| 24 | Q   -- about that? |
| 25 | A   Yes. |

94

EDWARD E. ANDERSON                                    01/08/08

1        Q    Okay.  I also noticed that there were sometimes

2   on a few dates when you would make an entry about your

3   machine being broken or being down.

4             Do you know what I'm talking about?

5        A    Yes.

6        Q    And is that something you also started doing

7   when the machines went down so you could record it on

8   these sheets?

9        A    When I started -- after I started getting paid,

10  yes -- I mean, you know, paying the $2.

11       Q    So after August of '05?

12       A    M-hm.

13       Q    You have to answer with words.

14       A    Yes.

15       Q    So we can tell by looking at all of these

16  documents when your machine went down and the dates and

17  that kind of thing?

18       A    Most of the time.

19       Q    Would you record on these sheets -- I did not

20  see any -- that recorded how long the machine was down?

21  Did you make that kind of entry, or would you just

22  generally --

23       A    Well --

24       Q    Let me finish.

25            Would you just generally write machine went

EDWARD E. ANDERSON                    01/08/08

1   down?

2       A    A lot of times I did not write that.  I started

3   writing that afterwards.

4           The sheets were blank, you know, so I started

5   writing afterwards that they were down.  And sometimes

6   they were down two weeks at a time because parts were on

7   order, they said.

8       Q    Would that two-week period be reflected in any

9   of these documents?

10      A    Sometimes -- they should be.

11      Q    So will you be able to look at these, then --

12  there was an extended period of time the machine was

13  down, we should be able to look at these to see when

14  those periods took place?

15      A    Yes.  But when I first started out, I did not

16  write that the machine broke, because it broke two or

17  three times, you know, and I just took it in stride.

18  But then they started breaking down more and more and

19  longer and longer, so I said I better keep a record of

20  this.  So I started --

21      Q    Once you started making that record, did you

22  continue to do so?

23      A    When it was broken, yes, I did.

24      Q    That's true up until today?

25      A    No.  Last week I had a breakdown, but it did

96

1    there also.  Then they took American completely out, and

2    they have Midwest and Air Canada now.

3        Q    Have you -- since that change has occurred

4    where these other airlines have taken over some of the

5    counter space, have you spoken to any of your managers

6    or supervisors about moving down the curb so you're in

7    front of an American ticket counter?

8        A    They cannot move me down there.

9        Q    Why is that, sir?

10       A    Because the belt is up there.  I've got a

11   separate belt up there, and they have a separate belt at

12   the other end.  They are only at each end, the east end

13   and the west end.

14       Q    Okay.

15       A    So they would not be able to move me.

16       Q    I understand that now.  Thanks for clarifying

17   that.

18            So there are actually two belts and they're

19   totally separate from one another?

20       A    Correct.

21       Q    Are you the only skycap servicing American's

22   belt at that point --

23       A    Yes.

24       Q    -- or at that location?

25       A    Yes.

EDWARD E. ANDERSON                    01/08/08

1    correct?

2            MR. O'BRIEN:  Yes.

3            THE WITNESS:  I get one of these and one of

4    these blank.

5            MR. ROESTI:  Could you identify what you mean

6    when you say "these," Mr. Anderson?

7            THE WITNESS:  Okay.  I'm sorry.

8            This is the American Airlines sales -- deposit

9    envelope here, the top?  And then the one that I get

10   also is baggage reconciliation sheet, which is blank at

11   the time.  And then when I take a tag off one of the

12   claim checks, I stick it on here.  This sheet actually

13   holds 80.  One full sheet holds 80.

14   BY MR. O'BRIEN:

15       Q   Okay.  And then, just so I understand

16   physically what you have to do on your job, at the end

17   of the day, it's 12:00 or 12:30 and your shift is over

18   for the day, what do you do with the envelope and the

19   sheets?

20       A   I take these and I go inside.  I count up my

21   money and I -- I count up all this, and then I take a

22   photostat of both of those, and I keep one and I give

23   them -- well, not them.  I take it into the office where

24   they count up your money, and then you put it in a safe

25   after someone signs it that seen me do that.

105

1    Q    So someone else counts the money to confirm it?

2    A    Yes.

3    Q    And then you sign off and you're done for the

4    day?

5    A    Yes.

6    Q    Let's get back then to where we were when I was

7    talking about Mr. Olson.

8         You said that you've gone into the office to

9    ask if you could move to the other belt; right?

10    A    Yes.

11    Q    And I think you indicated that he just says you

12    can't do that; right?

13    A    Yes.

14    Q    Does he explain to you why you can't move?

15    A    No.  No one ever -- no individual at American

16    Airlines has ever explained to me why I couldn't do it.

17    Q    Do you know Mr. Phil Bach?

18    A    Yes.

19    Q    Have you ever talked to Mr. Bach about moving

20    locations?

21    A    Yes.

22    Q    Can you estimate for us the number of times

23    you've requested that of Mr. Bach?

24    A    A couple of times when the machine was broken,

25    I said, can I use the other computers -- see, he was

106

1    are the only podiums there are.  It's the contractors'

2    podiums.  They are the only ones.  So if mine is broke

3    and there is three down there, it would have to be a

4    contractor's podium that I would use.

5        Q    Understood.  And they have three or four

6    podiums down there?

7        A    Yes.

8        Q    And they have three or four skycaps on duty

9    when you are on duty?

10       A    Yes.

11       Q    I have to ask these questions -- don't take any

12   offense -- just because of the nature of the claim.

13            Has anybody -- any supervisor or manager at

14   American said the reason you cannot use these other

15   podiums is because you're African American?

16       A    No, they have not said that.  No.

17       Q    Or because you're over the age of 40?

18       A    No, they have not said that either.

19       Q    Okay.  Let me see if I understand what the

20   nature of your claims are here.

21            Part of the time your podium does not work;

22   right?

23       A    In fact, quite a bit, quite a few times, yes.

24       Q    You cannot --

25       A    Weeks at a time.

1    Q    So what would you like to see happen up there

2    in terms of your own situation?

3    A    I would have liked to have been able to check

4    anywhere, anytime I got a bag, check in, where I -- so I

5    could make some money.  I could not make money.

6    Q    When you get there at 8:00 in the morning,

7    there are a number of the Globe skycaps already at work;

8    right?

9    A    Yes.

10   Q    I think you said they might get there as early

11   as 4:30 or 3:30?

12   A    Right.

13   Q    They're going to take the spots closest to

14   where the passengers are approaching; correct?

15   A    That's what they have been doing, yes.

16   Q    That's the first belt?

17   A    First belt, right.

18   Q    So when you arrive to work, those spots are

19   already taken by the Globe contractors; is that right?

20   A    Yes.

21   Q    And when you arrive to work, is there anyone

22   working your spot?

23   A    No.

24   Q    Is there anyone, for example, working on an

25   earlier shift and then you take over for them?

118

1    it was broke, I had nothing.  I just -- they would send

2    me to classes then.

3    BY MR. O'BRIEN:

4         Q    For example, I looked quickly through your

5    stack of papers, and you've got some classwork --

6    paperwork in there.

7              Is that the kind of classes you're talking

8    about?

9         A    I don't know what you have.

10        Q    Yes, I saw one or two.  You're talking about

11   online training?

12        A    Most of -- I don't know.  Most of those classes

13   that they gave, I took those books home.

14        Q    Okay.

15        A    There might be one or two.  I don't know.

16        Q    So if your machine is down, you go do some

17   classes?

18        A    Yes, if I don't have them done.  But that's

19   only about four times out of the whole years that they

20   gave me classes.  Other times I just sit around.

21             Jocelyn had asked me a couple of times, Well,

22   you want to go home?  I said, Am I going to get paid?

23   She said, No.  I said, Well, no, I don't want to go

24   home.

25        Q    Then you would just be paid the hourly rate?

121

1        A    I would be paid hourly rate.

2        Q    Can you describe for us generally what the

3    problems you've experienced with the machines are?

4        A    They would not print, and sometimes the

5    boarding card thing would not work.  They could not get

6    them to work.  And they would always come up with the

7    machine needs -- something has to be ordered, or

8    something like that.  So I don't know.

9        Q    You mentioned --

10        A    They just did not print or the boarding --

11    that's the main thing, is to print a baggage check and

12    get a boarding card, and they would not do either one of

13    those.

14        Q    You're currently using machine number 7?

15        A    Yes.

16        Q    Do you know if anybody has used that machine

17    before you?

18        A    I'm sure they have.  They've used all the

19    machines out there, so somebody has used -- not before.

20    I tell you what though.  Not before -- well, I don't say

21    not before.

22             But when they gave -- after 7, after he told me

23    this is your machine, this is the only one you use,

24    nobody that I know of used it, but, however, when I come

25    in in the morning sometimes, I could tell it had been

1    used.

2        Q    Do you know if someone who's employed by Globe

3    has used machine number 7?

4        A    That would have to be them because they are the

5    only ones there now, and I'm the only one there.  And

6    they have been used.

7        Q    Do you know if Globe skycaps have used machine

8    number 5?

9        A    Yes.

10       Q    And they still use number 5?

11       A    I don't know.  When it broke, they switched me

12   to 7, and that's what I'm supposed to stay on is 7.  I

13   don't know anything about -- oh, I do remember.

14           Somebody down at -- they are using 5.  Yeah,

15   they are, because I've seen it down there.

16       Q    Again, I will ask you these questions that I

17   don't mean to be asking ridiculous questions, but I have

18   to because of the lawsuit.

19           Has anybody who's a manager at American said,

20   well, we're going to give you a broken machine or a

21   defective machine or words to that effect because you

22   were an African American?

23       A    No one has ever said that, no.

24       Q    Or because you're over the age of 40?

25       A    They have not said it out, no.

123

EDWARD E. ANDERSON                                01/08/08

1        Q    Do you think Ms. Javier has done that because
2    of your race?

3        A    No, not that particular thing, no.

4        Q    Or because of your age?

5        A    No.

6        Q    Same questions for Mr. Olson?

7        A    Ms. who?

8        Q    Mr. Olson.

9        A    Olson?  Well, I can't -- you know, undoubtedly,
10   it must be because of my age.

11       Q    Let me go through -- let's talk then about
12   Mr. Olson specifically.

13            Has Mr. Olson ever said to you, look, you're
14   only going to get a defective machine or a broken
15   machine or words to that effect because of your race?
16   Had he said that?

17       A    No, he has not said that.

18       Q    Or because of your age?

19       A    No, he did not say it.

20       Q    Did Mr.~Bach ever say you're going to get stuck
21   with this machine because of your race?

22       A    No.

23       Q    Or your age?

24       A    No.

25       Q    What about Mr. -- I think you said Goshi?  Has

                                                        124

1    he ever said anything to that effect?

2        A    No, he has not.

3        Q    With about Ms. Harris?

4        A    She definitely has not, no.

5        Q    Has any American supervisor who we have not

6    named said you're only going to get stuck with these

7    machines because of your race?

8        A    No.

9        Q    Or your age?  Have they said that?

10       A    No.

11       Q    When the machine won't print, have you ever

12   been present when somebody has been able to get it to

13   work the same day that you report the problem?

14       A    Yes.

15       Q    And who does the -- I'll just call it repair

16   work, who does that?

17       A    I don't know his name.  But he's a computer

18   fixer for American Airlines.  He does the ones inside

19   and he also does the ones on the curb.

20            Sometimes when they call him, he cannot get to

21   me for two or three days after I reported that it does

22   not work or something like that.  Because he's busy.

23   He's the only person there at that time.

24       Q    You don't happen to recall his name?

25       A    No, I don't.

125

1       A    No, I don't think he does.

2       Q    But sometimes he's been able to come down and

3    fix it the same day?

4       A    Yes.

5       Q    What about this woman?  Has she ever come down

6    and fixed it the same day for you?

7       A    No.

8       Q    Have they ever told you I'm not going to fix

9    this for you because you are an African American?

10      A    No.

11      Q    Or because of your age?

12      A    No.  They try to fix it.

13      Q    They try to help you out?

14      A    Yes, they try to help me.

15      Q    Do you think that they are being genuine when

16    they are trying to help you?

17      A    Yes, I know he is.

18      Q    Have either one of them ever said to you, you

19    know, Mr.~Anderson, I would like to help you out, but

20    American has told me not to fix your machine?

21      A    No, they have not said that to me.

22      Q    They appear to genuinely want to get you back

23    to work?

24      A    Right.

25      Q    Have they ever been trying to work on one -- on

1    would work.  That was it.  She would call somebody.

2         Q    So she was trying to log in too?

3         A    Yes, she tried to log in.

4         Q    Did Mr. Olson ever try to log in?

5         A    No.

6         Q    Did mr. Bach?

7         A    No.  He only came out once.

8         Q    What about Mr. Goshi?

9         A    Mr. Goshi, he's been the most helpful of all,

10   trying to get things done.  He has been.

11        Q    Has he come out to try to get the machine

12   going?

13        A    He came out and asked me what the problem was,

14   and I showed him.  And he called and told somebody -- I

15   don't know who it was he called.  They did not come up

16   for a day or two.

17        Q    That would be the Asian fellow or the woman you

18   talked about?

19        A    I don't know who it was he called.

20        Q    Have you ever seen any of the Globe podiums go

21   out?

22        A    Yes.

23        Q    And have you seen this Asian gentleman try to

24   get it going --

25        A    Yes.

129

1    Q    -- or this woman you've mentioned?

2    A    Yes, I have.

3    Q    When their machines go out, do you know who

4  they report that to?

5    A    Same people that I have been reporting mine to.

6    Q    For example, Jocelyn?

7    A    They call management or something.  They call

8  operations.  And the guy at Globe, when he asked me what

9  was going on, he would call operations.  And we would

10 get the guy up here, and they couldn't fix it or

11 wouldn't fix it -- couldn't fix it.

12   Q    Do you know if they contact Jocelyn to let her

13 know of the problem?

14   A    Yes.

15   Q    Have you ever seen her go to try to help

16 someone who's a Globe employee get their machine back

17 and running?

18   A    No, because it's always so many people, you

19 cannot even see down there hardly.

20   Q    Okay.  Is there any maintenance that the

21 skycaps do to the machines?

22   A    You clean the head of it when it's smudgy, kind

23 of.  You just clean the head of the thing.  And you put

24 new bag tags in and boarding passes in when it runs out.

25 That's the only maintenance that's required by us after

130

EDWARD E. ANDERSON                                01/08/08

1    the passenger.  And if one of the legs is missing, they

2    say, well, so and so -- you say, well, you have to go

3    inside and they will take care of that for you.

4         Q    You mentioned that recently they changed the

5    monitors?

6         A    Yes.

7         Q    And they gave you keyboards?

8         A    Yes, a keyboard and a mouse.

9         Q    Has the rest of the podium stayed the same over

10   the years?

11        A    Yes, the podium has.

12        Q    Is it the same kind of podium that the Globe

13   contractors use?

14        A    Same.

15             MR. ROESTI:  Same.

16             MR. O'BRIEN:  Thanks for clarifying that.

17             MR. ROESTI:  I --

18             MR. O'BRIEN:  Sorry?

19             MR. ROESTI:  I didn't know if you were done or

20   what you were -- you said something and --

21             MR. O'BRIEN:  I said thank you for clarifying

22   that.

23             MR. ROESTI:  Sorry.

24             MR. O'BRIEN:  No problem.

25             Let's take a five- or ten-minute break.

134

1    basis for it.  If you want to continue to ask it, you

2    may take it to a judge, but I think he has answered it,

3    and I'm not going to have him answer it further.

4          MR. O'BRIEN:  Well, Counsel, asked and answered

5    is not a basis in this court for a direction not to

6    answer.  You know that.  It's a very simple question,

7    but I think that the record is muddled on it.

8          MR. ROESTI:  I think the question --

9          MR. O'BRIEN:  Let me finish my remarks.

10         So if I could just ask it one more time, I'm

11   happy to move on if we get a clear answer.  Okay?

12         MR. ROESTI:  I want to put a further objection

13   on the record.

14         It's vague as to time, meaning then or when,

15   and it's ambiguous for the same reason.

16         Now, if you understand the question, you may

17   answer it further.

18         THE WITNESS:  He's been rewording the question

19   to his benefit.

20         MR. ROESTI:  If you want to give your answer as

21   to when you told him what, you may do that.  You may

22   give a complete and full answer.

23         Right?

24         MR. O'BRIEN:  Yes, but I think we've already

25   established when he had the conversation.  What I'm

140

1    interested in is, did Mr.~Anderson, as I believe he

2    testified already, suggest the 8:00 start time?

3              MR. ROESTI:  I think what the record will show,

4    if you want to play it back, is he indicated that he was

5    not allowed to do it, that he told him he better check

6    with Dallas, and that subsequently there was a further

7    discussion --

8              MR. O'BRIEN:  I know what his testimony is.

9              MR. ROESTI:  Then if you know his testimony,

10   why are you asking the question again?

11             MR. O'BRIEN:  Because I don't think we have a

12   clear answer.  So if I can just get an opportunity here.

13   You know that asked and answered is not a basis for a

14   direction to not answer.  So let me try it one more

15   time.

16   BY MR. O'BRIEN:

17       Q    Did you suggest the 8:00 start time to

18   Mr. Olson?

19       A    When?

20       Q    You said in 2005, when you started working for

21   American.

22       A    I did not say that --

23             MR. ROESTI:  Do you understand the question?

24             THE WITNESS:  I understand the question, yes.

25             MR. ROESTI:  Then answer the question.

1          THE WITNESS:  But it was not in 2005.  This was

2    in 2001 when that took place.

3    BY MR. O'BRIEN:

4          Q    When you suggested 8:00 as the start?

5          A    I did not suggest it.  This was after he had

6    given me a shift of 10:00 to 2:00 in '02 -- I mean, '01,

7    whenever it was, when I first began, and I told him then

8    that you do not put any contractors over a regular

9    employee, and he told me, I can do anything I want.  I

10   do it.  He said, I'm going to do.  I said, Well, you're

11   wrong.  I said, If you don't believe me, check with

12   Dallas.  Because we're under court order that everything

13   stayed as status quo.

14          And as it was, status quo, I was working six

15   hours for TWA, and I should have came over at American

16   working six hours too.

17          Now, American Airlines does honor everything

18   else that was in that status quo, like you cannot

19   transfer, things of the nature like that, they honor

20   that.

21          Q    What did you say to him, though, about the

22   start time -- about changing the start time?

23          A    He did not change it until about three weeks

24   later, approximately three weeks later.

25          Q    I understand that when he did it --

142

1       A    No, you didn't say it, because --

2       Q    No, no.  I just want to know what did you say

3   to him as to what time you would like to start?

4       A    After he finally admitted that I was right,

5   then he asked me what time would I like to start, and I

6   told him I would like to start at 6:30 in the morning.

7   But he said, No, it cannot be done, because we have too

8   many people here then, and then plus all your other --

9   my TWA friends, they were starting early in the morning.

10          So I took that.  And he said, Then what time

11  would you like to start?  I said, It's not 10:00, that's

12  for sure.  I said, How about 8:00?  He said, Okay, 8:00

13  is fine.

14      Q    All right.  Thank you.

15          After you had this conversation with Mr. Olson,

16  did you ask him or any other supervisor after that to

17  change your start time?

18      A    What do you mean did I ask anybody else?  No.

19  He changed it.

20          MR. ROESTI:  No, no.  The question is -- if I

21  might rephrase it -- after it was established that you

22  would start at 8:00, did you ask anyone else to start at

23  6:30?

24          THE WITNESS:  No.

25          Is that what you were saying, 6:30?

1    BY MR. O'BRIEN:

2         Q    Or any other earlier time.

3         A    No.  Because when he told me that there were

4    too many men coming at that time, which I could see it,

5    he was right about that part, because we had three TWA

6    men coming around that time or earlier.  I don't

7    remember what time they were coming.  Some was coming in

8    at 3:30.  And he said that it's too many men in the

9    morning.  We need to spread some out.

10              And then when he said that, he said, Well, what

11    would be reasonable for you?  I said, Well, 8:00, since

12    I can't get the 6:30.  And he accepted.

13         Q    Have you read the complaint that was filed in

14    this lawsuit?

15         A    Not really.

16              MR. O'BRIEN:  Go ahead and mark this as Exhibit

17    1.

18              (Defendant's Exhibit 1 was marked for

19              identification by the Court Reporter.)

20              MR. O'BRIEN:  This is a complaint.

21              MR. ROESTI:  Okay.

22              MR. O'BRIEN:  There has not been an amended

23    complaint filed.

24    BY MR. O'BRIEN:

25         Q    Have you read the document that's been marked

144

1    record.  You can answer it.  But it is an extremely

2    overbroad question, but you may answer it.

3            THE WITNESS:  When they came up with this $2

4    per bag, that incriminated every one of us minorities

5    that -- one white worker and all the rest were

6    minorities, and they will accept anything to keep a job.

7    So yes.

8    BY MR. O'BRIEN:

9        Q   What facts are you aware of that make you

10   believe that it was done to impact you as a minority?

11       A   Well, they did not do it to the bartenders out

12   there in American Airlines' room.  They did not cut

13   their tips.  There is no charge --

14       Q   Are you aware of any other facts that suggest

15   to you that you were treated differently in your

16   employment at American because of your race?

17       A   Yes, that.  That's one reason.

18       Q   But my question was, are you aware of any other

19   facts that suggest that this action was taken by

20   American because of your race?

21       A   Age.

22       Q   I'm only talking about race.

23           MR. ROESTI:  He's only talking about race right

24   now.  Are there any other race questions -- are there

25   any other actions that --

EDWARD E. ANDERSON                                01/08/08

1             THE WITNESS:  No, I can't say.

2             MR. ROESTI:  -- besides race?

3             THE WITNESS:  No.

4    BY MR. O'BRIEN:

5        Q    Now, your counsel or you just prefaced the next

6    area of question.

7             Do you believe that any of these actions were

8    taken by American against you because of your age?

9        A    Yes, I do.

10       Q    Now I will ask you what facts you are aware of

11   that suggest to you that these steps were taken due to

12   your age?

13            MR. ROESTI:  Again, I put an objection on the

14   record.

15            This is an extremely overbroad and ambiguous

16   question.

17            But subject to that, you may list the facts

18   that you can presently think of.

19            THE WITNESS:  What --

20            MR. ROESTI:  I said you may list the facts you

21   can presently think of without limiting yourself to

22   other facts that it would be based on age.

23            THE WITNESS:  It's the quickest way to get rid

24   of all the employees at American with -- they are

25   concerned about money they had to pay out.  They've done

1    this all other the country.  Same thing going on at St.

2    Louis, Boston.  They doing the same thing, eliminating

3    all the fellows who are getting more money than the

4    contractors get.

5    BY MR. O'BRIEN:

6        Q    So the facts you're aware of that suggest to

7    you that it's because of the age is because this policy

8    is companywide?

9        A    And I take it because -- I say because they

10   take the money they make from me and pay the contractors

11   with it.

12       Q    This fee applies to the bags checked with the

13   contractors; correct?

14       A    It also applies to them too.

15       Q    And I believe you testified earlier today that

16   the majority of the contract skycaps are over 40 at San

17   Francisco?

18       A    Majority of them, yes.

19       Q    Are you aware of any other facts besides what

20   you've told us that support your belief that any of

21   these actions were taken against you by American because

22   of your age?

23       A    Trying to get me to sign off, and they were

24   trying to eliminate me by giving me bad equipment to

25   work with and not fixing it at least for two or three

149

1      A    That's what I'm getting ready to say.

2      Q    Okay.

3      A    All those people you named, the last ones you

4  named, they've all come here since all this has taken

5  place within a year.  All these different people are all

6  new within a year except Kathy and Jocelyn.  All these

7  others that you speak about, Mr. -- what's his name?  He

8  was not here when all of this stuff was going on.

9  Mr.~Bach, Mr. Goshi.  And there was another one -- I

10 can't think of his name -- he's gone on to -- and there

11 was one -- the only one was Mr. Olson, Ron Olson.

12          So these other people come in.  They don't know

13 anything about what transpires.  At least they pretend

14 they don't.  They say they don't.

15     Q    My question is a bit different, though,

16 Mr.~Anderson.

17          My question is, are there any other facts --

18     A    Those are facts I'm giving you now.

19     Q    Please let me finish the question.

20          Other than what you've already told us, are

21 there any other facts that any of these actions were

22 taken by American affecting your employment because of

23 your age?

24          MR. ROESTI:  To be really clear, you don't need

25 to repeat what you previously said.

154

1          THE WITNESS:  Okay.

2          MR. ROESTI:  If there's something new to add --

3     that I think he has a right to hear -- that you can

4     think of as you sit here.

5          THE WITNESS:  Nothing -- not other than what I

6     said, none of the other people, no.

7     BY MR. O'BRIEN:

8        Q    Let's go back and look at Exhibit 1 again.

9          MR. ROESTI:  Let me talk to my client.  There

10    is no question pending.

11          VIDEOGRAPHER:  We are now going off the video

12    record.  The time is 2:24 p.m.

13              (Recess Taken.)

14          VIDEOGRAPHER:  We are now back on the video

15    record.  The time is 2:31 p.m.

16    BY MR. O'BRIEN:

17       Q    Mr.~Anderson, did you ever file any kind of a

18    written complaint within American Airlines that you were

19    being treated differently because of your race?

20       A    No, I did not.

21       Q    Or because of your age?

22       A    No.

23       Q    Why not?

24       A    The reason I did not is because the guys in

25    St. Louis told me they had filed and they ignored it and

155

1      Q    Okay.

2      A    Try $40.

3           MR. ROESTI:  I'm confused.  Do you mean --

4           MR. O'BRIEN:  Why don't you ask him when I'm

5    done so we can move on.

6           Let's go ahead and mark Exhibit 2.

7           THE WITNESS:  Could I say something?

8           MR. O'BRIEN:  Let me --

9           THE WITNESS:  I say $40.  Should have added 30

10   that I am not -- I'm not collecting.  So that's close to

11   $70 total.

12   BY MR. O'BRIEN:

13     Q    Then I guess I'm still unclear.  Let me be sure

14   that you understand the question.

15     A    Yes.

16     Q    What I'm after is, I want to know what you

17   estimate to be the difference --

18     A    Oh, the difference.  Okay.

19     Q    -- between what you were making on average per

20   day in tips before the bag charge went into effect

21   versus what you're making now per day.

22     A    $40, I would say.

23     Q    I thought that was it.

24          MR. O'BRIEN:  Let's go ahead and mark Exhibit 2

25   then.

EDWARD E. ANDERSON                    01/08/08

1        Q    Have you had a chance to review that?

2        A    Yes, I have.

3        Q    Is this the document that we've been talking

4    about that Mr. Olson asked you to sign and that you --

5        A    No, it is not.

6        Q    Something different altogether?

7        A    Yes, it was different.

8        Q    Can you describe it at all?

9        A    It had a place down here for you to sign.

10       Q    This refers --

11       A    That was telling -- this is what they showed

12   us, and then they asked us to sign another paper,

13   different paper.

14       Q    To sign the other paper if you elected to leave

15   the company?

16            Look at the last paragraph -- or the second to

17   last paragraph.  Let me read it into the record.

18            "Because the restructured position is somewhat

19   different from your current position, you have the

20   option to elect layoff.  You would be eligible for

21   regular severance pay as described in the employee

22   policy guide.

23            If you would like to elect this offer, please

24   complete the attached form and return it to me no later

25   than August 15th, 2005.  If you choose not to elect

161

1    layoff, you will work with your manager to arrange

2    training and scheduling for transitioning to the

3    newly-created position."

4              Do you see that language I just read?

5        A    Yes, I see that.

6        Q    Do you know if the reference here to the

7    attached form is a reference to the paper he had asked

8    you to sign if you wanted to take that option?

9        A    Yes.

10       Q    Okay.  You didn't take that option, obviously?

11       A    No, I didn't.

12             MR. O'BRIEN:  Let's go ahead and mark the next

13   one.

14             (Defendant's Exhibit 4 was marked for

15             identification by the Court Reporter.)

16   BY MR. O'BRIEN:

17       Q    Have you had a chance to look at Exhibit 4,

18   Mr.~Anderson?

19       A    Not completely, no.

20       Q    Okay.  Take your time.

21       A    Okay.  Yes.

22       Q    Have you seen this document before?

23       A    Yes.

24       Q    And this is a notice of the claim on your labor

25   commissioner claim; right?

162

1      Q    I think I understand what you're referring to

2  there.

3      A    So skycap itself generates, and it is --

4      Q    Do you ask for tips now?

5      A    No, I don't ask for them, no.  I guess I do

6  when you ask for that $2 bag for -- everybody to say, I

7  thought that was your tip.

8      Q    Have you told people no, that's not your tip?

9      A    Yeah, I tell them all.  I show them on the

10  thing.

11      Q    So they know it's not a tip?

12      A    That's after?  Some of them say, well, that's

13  it, that's all I'm giving, which is quite a few of them,

14  which I can't blame.

15      Q    Have you as a result anything that American

16  Airlines has done gotten any kind of psychiatric or

17  psychological treatment?

18      A    No.

19      Q    Mentally, do you feel fine?

20      A    No, I don't feel fine.  No.

21      Q    Can you describe --

22      A    I don't sleep at nights because I think about

23  how I'm going to meet my bills and things.  I hardly

24  make money to get over to San Francisco to work.  I have

25  to take BART.

1    Q    As we sit here today, are you the oldest

2    employee among the skycaps and contract workers that

3    handle bags at the curb?

4    A    Yes, I am.

5    Q    What is your age?

6    A    I'm 75 -- I mean 74.

7    Q    What is your estimation of the next oldest

8    person below you?

9    A    That's working?

10    Q    Yes.

11    A    I think he's about 55 or 56, something like

12    that.

13    Q    Did Mr. Olson say or do anything that indicated

14    to you that his actions which you've described here

15    today might have been related to race?

16    A    No, not race, other than what we just spoke of,

17    age.

18    Q    Now, as we sit here today, how many African

19    Americans are working in the skycap either as employees

20    or contract workers for American Airlines?

21    A    There's two.  There's me and one other guy

22    named Jack.  He works for the contractors.

23    Q    And how many employees are there in the -- that

24    work for the -- in that area of the contract work and

25    also with you that handle the bags at the curb?

176

1    A    It's a total amount of two or three shifts.

2    Well, 13 or 15, I believe, total.  I'm not sure.

3    Q    Now, when American Airlines contracted with

4    TWA, to -- I'll use the phrase "take over" TWA employees

5    to work for American Airlines in the capacity of the

6    skycap and the baggage handler at the curb, at that

7    time, how many people were African American?

8    A    There were -- skycaps, there were four.  There

9    were six, but two retired.

10   Q    Out of the group of how many?

11   A    Out of a group of six of us.

12   Q    Those are the people that came more from TWA?

13   A    Well, I told him six, but I thought about it,

14   and it was four that actually came over.  The other two

15   retired before they came over.

16   Q    And how many people who are African American

17   were working at TWA in those positions when you joined

18   TWA -- let me rephrase the question.

19        How many African Americans were working for

20   American Airlines in those positions, whether as

21   employees or contracted skycaps, when you joined the

22   workforce with American Airlines?

23   A    I think there were three African Americans.

24   Q    About how many out of a total?

25   A    16 or 17 at that time.  I don't know.

177

1    When is the last time that you brought that

2    subject up?

3    A    I haven't since he told me that it was only --

4    there was no six-hour shift.  When Mr. Constantine told

5    me -- Constantine and Ron Olson both told me there were

6    no six-hour shifts on American Airlines.

7    Q    Prior to your complaint, did you bring that up

8    with any other agency, like the Fair Labor Relations

9    Board or the Labor Coalition?

10    A    I don't remember exactly if I did or not.

11    Q    And then Mr. Bach, did he ever indicate in any

12    way to you that either adverse actions he took or the

13    continuation of adverse actions might be related in any

14    way to age discrimination or age?

15    MR. O'BRIEN:  Objection, leading.

16    THE WITNESS:  No, he did not.

17    BY MR. ROESTI:

18    Q    So did you see anything in his conduct or words

19    that indicated that any adverse actions against you or

20    the continuation of adverse actions was related to

21    racial discrimination?

22    A    I hardly ever seen him, so we had no

23    discussions after we won.  We spoke when I seen him.

24    That was it.

25    Q    Do you have any evidence to indicate that the

# EXHIBIT "B"

# AmericanAirlines®

December 20, 2001

Edward Anderson
SFO

On behalf of American Airlines Customer Services Department, we are pleased to offer you the Level 50 position of Skycap at an hourly pay rate of $10.45. This position is located in SFO and we would like you to begin work on January 1, 2002.

Please be advised that while Skycaps at TWA are Passenger Service Employees, this function is performed at AA by non-agent support staff employees. If you accept employment with AA as a Skycap, you will no longer be an agent or have recall rights to an agent position.

If you choose not to accept the above position or do not report for work when advised, you will have no status with AA. Please sign below to indicate your acceptance of this offer, and return it to your supervisor.

We believe that this position will offer you a challenging opportunity and will be both personally and professionally rewarding. All of us at American Airlines look forward to welcoming you aboard and to working with you!

Sincerely,

Daniel P. Garton
Executive Vice President
Customer Services

_Edward E. Anderson_
Acceptance Signature

_12-20-01_
Date

Copies to:    Corp. Personnel File
              Local Dept. Personnel file

SKYCAP

EXHIBIT
1/8/08
2
anderson

# EXHIBIT "C"

6/8/07  9:40 AM

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

<table>
<tr><td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AMR The parent of AMERICAN AIRLINES INC, AMERICAN
AIRLINES, and DOES 1 through 5 INCLUSIVE.


**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
EDWARD E. ANDERSON

</td><td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

</td></tr>
</table>

You have **30 CALENDAR DAYS** after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.  There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.  Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.  Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA, SAN FRANCISCO
400 McAllister Street
SAN FRANCISCO, CA 94102

</td><td>

CASE NUMBER
*(Número del Caso):*
CGC07 - 459441

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
EDWARD E. ANDERSON 510-825-2549
801 GALWAY DR #9 SAN LEANDRO, CA 94580

<table>
<tr><td>DATE:<br>*(Fecha)*  JAN 9 2007</td><td>GORDON PARK-LI<br>CLERK, by<br>CRISTINA E. BAUTISTA<br>*(Secretario)*</td><td>, Deputy<br>*(Adjunto)*</td></tr>
</table>

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

<table>
<tr><td>

[SEAL]

</td><td>

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* American Airlines, Inc.

under: ☒ CCP 416.10 (corporation)           ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

</td></tr>
</table>

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 485
American LegalNet, Inc.
www.USCourtForms.com

# EXHIBIT "D"

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 550-2006-00113 |

| California Department of Fair Employment and Housing | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| Mr. Edward Anderson | (510) 825-2549 | 04-09-1933 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 801 Galway Dr., #9, San Lorenzo, CA 94580 | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| AMERICAN AIRLINES | 500 or More | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| S. Francisco International Airport,  , CA 94128 | | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☐ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)* | Earliest          Latest<br>01-24-2006<br>☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was hired by the Respondent on May 25, 1978.  My job title is Skycap.  From August 2005 to the present, I was harassed.  For example, my Supervisor, Ron Olson, Customer Service Manager, Jocelyn Javier, and Station Manager, Phil Bock, demanded me to sign a letter stating that I will accept different terms of employment or leave.  From August 2005 to the present, I was subjected to disparate treatment.  For example, my Supervisor, Ron Olson, Customer Service Manager, Jocelyn Javier, and Station Manager, Phil Bock, moved me to a different job location away from my co-workers and did not issue me the proper equipments to do my job.

Respondent did not provide a reason for the discriminatory acts.

I believe I have been discriminated against because of my race (Black), in violation of Title VII of the Civil Rights Act of 1964, as amended.  I further believe that I have been discriminated against because of my age (72), in violation of Age Discrimination in Employment Act 1967, as amended.

RECEIVED

JAN 27 2006

BY: SAN FRANCISCO DISTRICT OFFICE

**RECEIVED**

JAN 24 2006

**EEOC-SFDO**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *1-24-06*  *Edward E. Anderson*<br>Date     Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |